IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Estate of: | ) | |
| | ) | No. 31757-9-III |
| Margaret Wimberley, | ) | |
| | ) | |
| Deceased | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

FEARING, J. — Two brothers, James and Wesley Wimberley, quarrel over assets in their parents' trusts. The trial court removed James Wimberley as the successor trustee of the trusts and personal representative of the estate of the mother, Margaret Wimberley. James Wimberley's successor trustee, Stephen Trefts, performed an accounting and concluded that James over-distributed to himself the amount of $254,437.91 in trust assets. Trefts petitioned the trial court for approval of the accounting. James appeals the trial court's approval and order directing him to reinstate $254,437.91 to the mother's trust and estate. We affirm all trial court orders.

## FACTS

C.W. and Margaret Wimberley married on July 7, 1945. They bore and raised two children, Carroll Wesley Wimberley (Wesley) and James Keith Wimberley (James). C.W. and Margaret Wimberleys' estate planning process spanned the course of many years. This statement of facts follows the creation and administration of a family trust and changes to the trust, after the death of husband C.W. Wimberley, with Wesley or James lurking in the background.

On August 17, 1967, C.W. and Margaret executed a community property agreement designating all property owned or later acquired by the couple as community property. On January 15, 1999, the couple created a revocable living trust: "The Wimberley Family Trust, C.W. Wimberley and Margaret Wimberley, Trustor and/or Trustees" (Trust). The Trust identified C.W. and Margaret as trustors, one of them as survivor trustee upon the death of the first spouse, and beneficiaries while living. The Trust named James and Wesley Wimberley as heirs and primary beneficiaries. The trust designated James as successor trustee, upon the deaths of C.W. and Margaret. As trustors, C.W. and Margaret Wimberley retained the power to make amendments to the Trust or change its beneficiaries, but only as long as both remained alive.

The Wimberley Family Trust, like many family trusts, contained A-B-C trust provisions. The instrument directed the surviving trustee of C.W. and Margaret Wimberley to divide the Trust equally into two shares: Survivor's Trust A (Survivor's

2

Trust) and Decedent's Marital Share ("Decedent's Trust B" and "Decedent's Trust C"),

upon the death of the first spouse. The purpose behind this division was to avoid or limit

estate taxes.

The Wimberley Family Trust instrument read:

### Survivor's Trust A
Survivor's Trust A shall consist of the Survivor's one-half (1/2) interest in the commonly owned property or community property, quasi-community property and all other property included in the Trust Estate as the separate property of the Surviving Trustor. Upon division into shares at the death of a Trustor, *Survivor's Trust A shall remain revocable by the Surviving Trustor during the life of the Surviving Trustor. Upon the death of the Surviving Trustor this share shall become irrevocable.*

Any property not allocated to the Decedent's Marital Share, or otherwise allocated by the provisions of this Trust at the death of the first of the Trustors to die, shall be allocated to this Survivor's Trust A.

### Decedent's Marital Share
Decedent's Marital Share shall consist of the Decedent's one-half (1/2) interest in the commonly owned property or community property of the Trust Estate, one-half (1/2) interest in the quasi-community property and all other property included in the Trust Estate as the Separate Property of the Decedent Trustor. Decedent's Marital Share shall be divided and allocated into Decedent's Trust B and C. *Upon creation of such Trust shares, Decedent's Trust B and Trust C are irrevocable.*

The Surviving Trustee shall have the sole discretion to select the commonly owned, community and quasi-community assets or the proportionate share of any such assets which shall be included in the Decedent's Trust B and Trust C. In no event, however, shall there be included in Trust C any assets or the proceeds of any asset which will not qualify for the federal estate tax marital deduction, and Trust C shall be reduced to the extent that it cannot be created with such qualifying assets. The Trustee shall value any asset selected by the Trustee for distribution in kind to the Decedent's share at the value of such asset at the date of distribution to the Decedent's share.

Clerk's Papers (CP) at 138-39 (emphasis added).

Under the Trust document, Decedent's Trusts B and C would pay their net income to the surviving spouse, while the principal of Trusts B and C could pay for the survivor's health care, education, support, and maintenance. Decedent Trust B also allowed, at the surviving spouse's request, a year-end principal payment of $5,000 or 5 percent of the trust's aggregate value.

C.W. and Margaret desired to place all their assets in the Trust. The Wimberley Family Trust instrument read:

> The Trustors intend this Trust to be the recipient of all their assets, including without limitation assets whether commonly owned, jointly owned, marital, deferred marital, community, quasi community or separate. The Trustors intend this trust to be the named beneficiary of all interests of which either or both Trustors are, or may become, Beneficiaries.
>
> . . . .
>
> Property held by the Trustees of this Trust, which is held in trust for the benefit of the beneficiaries subject to the provisions of this Trust Agreement, is and shall be property owned by the Trust.
> The Trustors have paid over, assigned, granted, conveyed, transferred and delivered, and by this Trust Agreement do hereby pay over, assign, grant, convey, transfer and deliver unto the Trustees their property . . . any other property that may be received or which has been received by the Trustees hereunder, as invested and reinvested (hereinafter referred to as the "Trust Estate"), shall be held, administered and distributed by the Trustees as hereinafter set forth.

CP at 114. A 1999 deed placed title to real property in the Wimberley Family Trust. Numerous financial account statements designated the trust as the account holder.

The Wimberley Family Trust instrument mentioned the possibility of loans from

4

the parents to James and Wesley and directed that such loans be forgiven upon the death of the parents, but reduce the debtor son's distribution of trust assets. The instrument read:

> ### Gifts or Loans
> The Trustee shall reduce a Beneficiary's share by any gifts or loans as shown in Schedule A.

CP at 158. No gifts or loans were ever recorded in Schedule A.

At the time of executing the trust instrument, C.W. and Margaret signed wills. Both wills contain "pour-over" provisions that:

> give, devise and bequeath all the rest, residue and remainder of my property of every kind and description (including lapsed legacies and devises), wherever situated and whether acquired before or after the execution of this Will, to the Trustee under that certain Trust executed by me, which is known as "The Wimberley Family Trust."

CP at 359. A pour-over will is a testamentary device wherein the writer of a will creates a trust and decrees in the will that the property in his or her estate, at the time of his or her death, shall be distributed to the trustee of the trust.

The Wimberleys also articulated their wishes in a Letter of Intent and Declaration of Gift, executed as part of the Family Trust:

> As part of our estate plan, we have established a Revocable Living Trust. We have transferred property into the Trust and in the future we will take property out and put it into the Trust as we desire. It is our intent that all property held in the Trust be our commonly owned or community property, subject to the laws governing joint ownership. In confirmation of this intent, we make the following declaration:

5

1.      All property held by the undersigned in the Trust . . . is the commonly owned or community property of the said Trustors unless otherwise designated by writing in the Trust documents, or in the manner in which title is held in the Trust.

2.      All property which is the separate property of either Trustor has been and will be so designated in writing and signed by the Trustors.

3.      Any property in the said Trust which had its origin as separate property, or which cannot be traced as to its origin, is the commonly owned or community property of the Trustors. If any question should arise, it is the intent of each of the Trustors to gift, in consideration of their mutual love and affection, so much of any disputed property to the other as is necessary to create joint ownership in both Trustors. This gift is intended and made as and when any asset is placed into the Trust.

4.      Any previous community property agreement entered into between the undersigned shall no longer be applicable to, and is thereby revoked with respect to, all property held by the undersigned in the Trust known as: **The Wimberley Family Trust.**

CP at 175.

C.W. Wimberley died on January 20, 2002, rendering Margaret Wimberley, at the age of 85, the Trust's survivor trustee. The Trust instrument directed her to divide the trust in half, with one-half becoming Trusts B and C. Margaret never divided the Trust into the Survivor and Decedent's trusts.

On July 18, 2007, five years after the death of C.W., Margaret Wimberley amended the Wimberley Family Trust "so as to fully comply with the Trust Laws of the State of Washington." CP at 178. Richard C. Greiner, a Yakima estate planning attorney, drafted the amendment. The 2007 amendment contained provisions that contradict key provisions of the original Trust.

The 2007 amendment stated in part: "Given the changes to the Federal Estate Tax

6

laws, the Surviving Trustor/Trustee elects to not fund trust assets into what would be a 'decedent's trust'. . . . The Surviving Trustor shall have full use and control over all trust assets." CP at 178. The amendment did not specify which changes to the federal estate tax laws necessitated this substantial revision from the original Trust instrument. To the contrary, the amendment may have created more tax liability for the Wimberley family. Stephen Fry, an attorney with whom Margaret later consulted, testified:

> [T]he federal estate tax will reset to $1 million in 2011 and by her failure to fund the irrevocable trust, and instead fund the revocable Survivor's Trust A that is for her sole benefit, she has subjected the value of her estate, including the Survivor's Trust A, which exceeds $1 million, to federal estate tax. As a consequence of failing to fund the irrevocable trust, Margaret's estate could pay approximately $200,000 in federal estate tax!!

CP at 325.

The 2007 amendment also changed the distribution proportions of the Trust's assets. Under the original terms of the Trust, James Wimberley, as successor trustee, upon Margaret's death, would divide all trust assets into equal separate shares and distribute them to Wesley and himself. The 2007 amendment further added a provision to the distribution instructions:

> Primary Residence: The Trustor's primary residence located at 386 Fromherz Road, Yakima Wa. and all of the surrounding property, buildings, improvements and fixtures and supporting equipment used on that property shall be distributed unto James K. Wimberley as compensation time, labor and other resources in improving the property. *This distribution shall not be subject [to] offset against his share [of] the residual trust.*

7

Further, the entire balance of the building fund account held with Yakima Federal Savings and Loan Association shall be set aside from all of the Trustor's other accounts and investments and be distributed to Jim for the purpose of finishing the ongoing work on the property. Jim shall use this fund at his sole discretion toward finishing the property and the fund shall not be offset against his share of the residual trust.

Residual Distribution: The rest, residue and remainder of the trust assets shall be divided in equal shares between Jim and Wes as forth in the trust document and shall be subject to the specific distribution set forth above.

CP at 179-80 (emphasis added).

Margaret Wimberley had earlier expressed a desire to leave the Fromherz Road residence to James. In a handwritten letter to Richard Greiner, dated August 31, 2006, Margaret stated:

With respect to the Family Trust (WFT) my wishes are as follows:
1. 386 Fromherz Road property, improvements, and equipage to transfer to Jim (son). This is not meant to be an inheritance. It is in consideration for his help and responsibility from beginning to completion of the improvements. It is my home and residence so long as I live and capable on my own or with assistance.

CP at 221. According to attorney Greiner:

7. During the 2007 conversations, Margaret wanted to ensure that James would have the house, free from any interest by Wesley. She explained that James and CW built the house and James continued to work on the house after CW's passing. She wanted James to have the house as repayment for the time and labor that he put into the house.
8. Margaret also explained that there was much work to be done to finish the house so she had established an account that she named the "building fund" account at Yakima Federal. The "building fund" actually consisted of two accounts, a checking account No. 5734, and a savings account No. 5370. Margaret wanted those funds to be James' fund to finish

8

the house and to be James' inheritance, free from Wesley's share of the trust.

9. Therefore at Margaret's direction I prepared the 2007 amendment to the trust which Margaret edited multiple times and signed on July 18, 2007.

10. James transported Margaret to my office; but on each of our visits, I requested that James leave the room so that I could talk to Margaret candidly. I am certain that she was not being manipulated by James.

CP at 195.

Richard Greiner maintains that Margaret "knew exactly how she wanted to leave her bounty and she was clear in expressing the same to me." CP at 195. According to Greiner, Margaret worried about the relationship between her sons. She characterized Wesley as "the one who went out and made his way in the world" and she characterized James as "the one who stayed with us to help and protect us." CP at 195.

On April 3, 2008, Margaret Wimberley amended the Wimberley Family Trust again. The amendment contained three significant changes. The Trust became irrevocable with "no further changes to the trust, or the identity of the trustee, or the distributive provisions." James Wimberley became trustee, with the added condition that he "not be removed as trustee except for a finding by the trust protector that he has violated a fiduciary duty owed to Margaret V. Wimberley." The 2008 amendment anointed Richard Greiner as Trust Protector "to amend the trust where necessary to effect [sic] the initial intent of the Trustor and to appoint Trustees of the Trust, when necessary." CP at 187-88.

9

Richard Greiner drafted the 2008 amendment. Greiner later recounted Margaret

Wimberley's reasons for drafting the second amendment:

> 11. In February of 2008, Margaret again made an appointment to amend the trust. When we spoke, she was more deeply concerned about the relationship between James and Wesley and was very concerned that Wesley would try to do something to manipulate her.
> 12. Margaret did not want to be in the position that she could be manipulated by Wesley and therefore directed me to prepare a document for her resignation as Trustee and to appoint James as the Trustee. She also asked me to be the Trust Protector of the Trust, to ensure that the Trust plan could not be altered.
> 13. After numerous edits by Margaret, she signed the 2008 amendment.
> 14. Again, Margaret met with me in my office alone when we talked about these goals and changes.

CP at 195-96.

In September 2009, Margaret Wimberley asked Richard Greiner's office to

prepare a deed for the Fromherz house, for the purpose of conveying the home

immediately to James Wimberley:

> While I occasionally saw Margaret after April of 2008 our next purposeful meeting was September of 2009 when she asked me to prepare a deed of the house on Fromherz to James. At that time I became concerned that Margaret was not thinking as clearly as I had witnessed in our past meetings. However, Margaret was very clear and determined that she wanted to sign over the entire house to James at that time. Upon Margaret's insistence, I prepared a Quit Claim Deed to effect the transfer, but I did not record said deed. I specifically talked to Margaret about whether James had put pressure on her to transfer the house and I was convinced that he had not. At Margaret's request, I held the deed and it was not filed but remained in my files.

CP at 196.

10

In December 2009, Wesley Wimberley thrice accompanied his mother, Margaret Wimberley, to Yakima Federal Savings and Loan, where the Wimberley Family Trust maintained its principal bank account. During the first visit, Wesley Wimberley obtained copies of account withdrawals made by James Wimberley from the trust's checking and savings accounts. On the second visit, Margaret withdrew $26,000 from the trust savings account, which Wesley maintains went to him as part of the 2009 annual estate gifting. During the final visit, Margaret withdrew $280,000 in the form of a cashier's check, which she and Wesley took to Yakima Valley Credit Union, where they met with Suzie Williams, an investment advisor. The money, however, was later deposited at Umpqua Bank into a nontrust account. By the terms of the 2008 amendment, Margaret no longer served as trustee when she made these withdrawals from the trust's bank accounts. We are not told if Wesley Wimberley then knew of the 2008 amendment to the Wimberley Family Trust.

On January 11, 2010, Richard Greiner learned of the withdrawals from Yakima Federal Savings and Loan. Greiner later declared:

> James brought Margaret into my office. He explained that he had discovered that Margaret had removed some $306,000 of Trust money from the Irrevocable Trust account at Yakima Federal Savings and had transferred $26,000 to Wes, and deposited the remaining $280,000 into her personal name. I discovered that Margaret and Wesley had met with Ms. Suzie Williams at Members Financial, located at then Yakima Valley Credit Union.

11

> Margaret's demeanor on January 11, 2010, struck me as very frail. While she recognized me and called me by name, she had remarkably aged and was very frail physically and mentally.
> She did not remember going to either Yakima Federal or going to Yakima Valley Credit Union.
> She did not remember moving any money from the trust.
> She did know that James was the Trustee of the trust.
> When I talked to Margaret alone, she was very confused about her finances and did not know where any of her money was located.
> Margaret was so mentally frail that she would have signed anything that I asked her to sign or do anything that I asked her to do.

CP at 197. On February 8, 2010, Greiner wrote a letter to Wesley Wimberley "demanding to know what the purpose of the transfer was." CP at 197. He received a response from attorney Carter Fjeld, with whom he corresponded by mail through March 2010.

On April 9, 2010, Wesley Wimberley and his wife took Margaret Wimberley to attorney Marcus J. Fry. Fry later declared:

> As is my practice, when family is present, I first cover background information. This is helpful, particularly if the elderly person is having some memory issues. There was also a discussion about issues between Jim and Wes and the lack of access Wes' family had to Margaret, including an incident while Margaret was at the hospital.
> 4. I then discussed the purpose of the visit, which was to review her estate planning and explain to Margaret her estate plan, which consisted of a large binder of documents. In the large binder was a trust document entitled, the Wimberley Family Revocable Living Trust, dated January 15, 1999.

CP at 321.

In April 2010, Marcus Fry reviewed the Wimberley Family Trust documents:

. . . I noticed that upon the passing of Margaret's husband, the trust created two trusts, an irrevocable trust and a revocable "Survivor's Trust." This is common estate planning as is generally referenced as "A-B estate planning." I inquired as to what was placed into each of these trusts and she was unsure what had [been] placed into each of them. I then reviewed two trust amendments to the trust and she was unaware of the effect of these. I then asked her to tell me what she thought her estate plan did. She stated that it divided everything equally between her two sons, but that her son Jim received the house that she was living in and that he was helping to build. I explained to her that in my opinion her trust as written did not carry out this plan and that the house and funds in a designated account came off of the top before being divided. She stated that this is not what she wanted.

6. About that time, I then requested that both Mr. Wes Wimberley and his wife excuse themselves from the meeting so that I could meet with Margaret alone. This is standard procedure when I have family who are part of the initial meeting. I then questioned Margaret alone about her estate plan more specifically.

CP at 321-22.

Attorney Marcus Fry discussed with Margaret Wimberley differences between her

intentions and the language of the Wimberley Family Trust amendments:

First, she was unaware of the potential estate tax liability she may have exposed her estate to by not funding the irrevocable trusts created upon the passing of her husband, C.W. I advised her that as of right now, the federal estate tax will reset to $1 million in 2011 and by her failure to fund the irrevocable trust, and instead fund the revocable Survivor's Trust A that is for her sole benefit, she has subjected the value of her estate, including the Survivor's Trust A, which exceeds $1 million, to federal estate tax. As a consequence of failing to fund the irrevocable trust, Margaret's estate could pay approximately $200,000 in federal estate tax!! This is something she certainly wants to avoid and desires to correct.

Second, I advised her that by electing not to fund the irrevocable trusts, she has likely breached her fiduciary duty and may be confronted with a lawsuit from either of her two sons, Jim Wimberley and Wesley Wimberley, or their children (Margaret's grandchildren) for her failure to

13

properly fund C.W.'s irrevocable trusts. Again, she indicated this is something she wants to avoid and obviously can be by properly funding the irrevocable trust.

Third, I discussed the fact pursuant to the terms of the amendment she has no control of her own assets. She was rather surprised by this as well as. [sic] I explained to her that unless there is a tax avoidance benefit, usually a person does not change a revocable trust to irrevocable and eliminate one's authority to handle and dispose of his/her assets as he/she sees fit. In fact she was under the impression that she had the authority to handle and dispose of her assets and Jim was only assisting her, not controlling her affairs. I corrected her misunderstanding informing her that the amendment stated that she only had the right to use her property, but retained no decision-making authority over her own assets. Margaret desires that the trust be changed to revocable and that we eliminate the sole condition for removal of Jim as trustee as she believes that an independent professional trustee should be appointed to avoid future disputes between her two sons regarding her assets.

CP at 325-26.

After speaking with Marcus Fry, Margaret Wimberley terminated Richard Greiner as her attorney; revoked the general durable power of attorney she previously granted to James Wimberley; and contracted Kristyan Calhoun, a geriatric care manager, to assess her living situation and relationships with her children. Fry characterized the situation as a "tug-o-war" between James and Wesley, but insisted:

At no time during my meeting with her did I feel or sense that she was being unduly influenced or manipulated. Rather it was clear to me that she had been involved in unusual estate planning that was not clearly explained to her and that did not reflect her wishes.

CP at 322.

Attorney Marcus Fry memorialized events in a letter that he sent to Richard

Greiner and James Wimberley, on April 13, 2010. Three days after Fry mailed the letter,

James delivered a handwritten note to Fry, from Margaret Wimberley:

> . . . I had not thought through all things at the time of our meeting; so at this time I insist that all be returned to where we started and that you put Jim back in the position of Power of Attorney. He is to be the only Power of Attorney. <u>I insist today</u>.
>
> So, please prepare the required letter or documents for that Power of Attorney for Jim's reinstatement and send myself, Jim, and Rich Greiner a copy. Also send a copy to Rich G. by fax.
>
> I want everything reinstated as to before we talked. I <u>insist immediately—today</u>. Thank you.
> Margaret Wimberley
> April 16, 2010—2pm
> No, I will not discuss this matter further at this time.
> The above written I left message on Marcus Fry's voicemail—
> 2:15pm 16 April MPW

CP at 333. Fry stated that Margaret's voice on the voicemail "was shaky and sounded

fearful," and that he "became very concerned about manipulation that may be occurring

with Margaret by her son Jim." CP at 322.

On April 29, 2010, Kristyan Calhoun began her evaluation of Margaret

Wimberley, then age 93, for the purpose of producing a professional care plan at the

request of Margaret and attorney Marcus Fry. Calhoun visited with Margaret five times,

three times privately.

Kristyan Calhoun assessed Margaret Wimberley's cognitive functioning:

> I find that Mrs. Wimberley is able to make limited decisions when presented with factual information. She is not able to consistently recall events from the past 5 plus years. Mrs. Wimberley is not aware of her estate value. She does not know whether or not she has a professional who

15

assists her with financial matters. She does not know where her accounts are located. She relies on her son, Jim Wimberley to ensure that bills are paid in a timely manner. She does not believe that she has a lot of money but enough to meet her financial obligations and to be comfortable. She was not able to recall names of her grandchildren during two visits and was not able to tell me the name of Wes['] wife on one occasion. She does not know how long she has lived in her home. She was not aware of how long ago her husband passed away.

I believe that Mrs. Wimberley will believe whatever she is told by her family, friends or professionals. The way that information is presented to her in conversation is very important as to how she will make a decision. It is unfair to discuss issues related to her finances, estate planning and living arrangements with her. This only causes anxiety and continued conflict within the family.

CP at 202-04.

When speaking with Kristyan Calhoun, Margaret Wimberley did not remember meeting with either Marcus Fry or Richard Greiner. Margaret consistently expressed a wish that her sons receive equal shares of her estate, and that James Wimberley receive the Fromherz residence:

Mrs. Wimberley was able to understand that she had met with two attorneys and had made changes that appeared to be opposite of each other. She stated that she does not remember meeting with attorneys. I asked her on three separate occasions to help me clarify what her wishes in regards to her estate were. The first time she stated that she wanted things split 50/50 with the boys. . . . She stated that the home was to [be] Jim's when she passed away but it was hers for now. I asked her about the possessions in the home. She stated that those needed to be split between the boys. I asked her if this was consistent with documents that she signed and she stated that she hoped that it was.

The second occasion . . . she told me that C.W. took care of all of that before he died. I explained again that she had met with two attorneys and had made different plans. She did not recall the attorneys and stated that she did not want to hurt the boys and did not want them fighting. I

16

asked her if she would be willing to meet with the two attorneys and myself at her home so that she could discuss this. She stated that she would rather not. I asked her if she remembered talking to me about her estate in the past. She did not.

The third time . . . she told me that she did not want to choose between her sons and that she should be able to just leave a note for them and not have to talk about this. . . . I asked her who the house belonged to. She stated that it was hers until she dies and then Jim's. I asked her where she would like her furniture, bank accounts and things to go. She stated that she would like them to be split between the boys.

CP at 203.

Kristyan Calhoun found Margaret Wimberley "highly susceptible to undue

influence:"

Mrs. Wimberley does not believe that either of her children has been able to access her accounts other than her son Jim, who pays monthly bills. She does not believe that she has given either son permission to take money from her accounts for their own use. I asked her if she had any concerns with her sons making investments for her. She did express concern that Wes not have access to her accounts. She stated that he has struggled with managing his finances. She does not believe that she has loaned money to either of her sons since her husband passed away.

. . . .

I recommend that Wes Wimberley not contact financial institutions to access information either with or without his mother. Mrs. Wimberley's forensic accounting should provide all information that is requested by Wes Wimberley. I do not feel that Mrs. Wimberley would say no to either of her sons to avoid a conflict. She has stated her concerns regarding Wes accessing her accounts and that neither of her sons discuss her estate or finances as it relates to inheritance.

CP at 203-09.

Wesley Wimberley told Kristyan Calhoun that he was concerned about the

Fromherz home needing substantial repairs. Margaret Wimberley was not concerned and

17

felt that "Jim will get to the projects as he has time." CP at 204. James Wimberley told Calhoun that the funds for completing the house had been transferred out of the account by Wesley in the December 2009 visits to Yakima Federal Savings and Loan. Calhoun recommended that a local accounting firm complete a forensic accounting, retroactive to 2002, to address bank account withdrawals and outstanding loans that both brothers claimed the other received from Margaret.

Finally, Kristyan Calhoun recommended that Margaret Wimberley hire a caregiver to assist with her daily care and to address the conflict between Wesley and James Wimberley. Calhoun recommended that Wesley and his wife only visit and call Margaret during the caregiver's shifts, in order to avoid the past friction and allegations between James and Wesley regarding their mother's care. Calhoun finished her report on May 13, 2010.

On May 27, 2010, Richard Greiner sent a letter to Carter Fjeld and Marcus Fry. Greiner stated that, in light of Calhoun's report, he would "not step away as Trust Protector and will not bow to the demands of Marcus' letter of April 13th." CP at 335. Greiner stated that he believed Margaret Wimberley was not capable of understanding her estate when she met with Fry at the beginning of April and that the information "must have come from Wesley." CP at 335. Greiner also demanded that Wesley return the $26,000 he received from his mother in December 2009.

18

Marcus Fry responded to Richard Greiner's letter on June 7, 2010. He clarified that Margaret Wimberley had terminated Greiner's position as her attorney, not as Trust Protector. He also reiterated his concerns regarding Margaret's failure to fund the irrevocable Decedent's Trusts in accordance with the terms of the trust and that attempting to do so now or upon Margaret's death would incur "the wrath of the Internal Revenue Service." CP at 338.

Before the implementation of Kristyan Calhoun's recommendations, Margaret Wimberley died on August 2, 2010. On August 11, James Wimberley was appointed personal representative of Margaret Wimberley's estate. Under the terms of the 2008 amendment, James had served as trustee of the Wimberley Family Trust since April 2008.

On June 28, 2011, James deeded the Fromherz home to himself. After Margaret's death and while James served as trustee of the Family Trust, James used trust funds to pay for groceries, tires, car insurance, and his personal phone bill.

## PROCEDURE

On November 1, 2011, Wesley Wimberley petitioned the court to remove James Wimberley as personal representative of Margaret Wimberley's estate and trustee of the Wimberley Family Trust. On January 20, 2012, Wesley moved to disqualify Richard Greiner as Trust Protector, and from acting as James Wimberley's attorney. Wesley

19

argued that Richard Greiner cannot fulfill his duties as Trust Protector while filing motions and petitions against one of the beneficiaries.

On March 2, 2012, the trial court issued an order removing James Wimberley as trustee of the Wimberley Family Trust and appointing Stephen Trefts, dba Northwest Trustee & Management Services, as successor trustee. The order also removed Richard Greiner as Trust Protector. On March 2, the trial court directed Trefts to complete an accounting of the Wimberley Family Trust from C.W. Wimberley's death, on January 20, 2002, to the present. The court directed James Wimberley to turn over all family trust account records to the successor trustee. The court found that James Wimberley breached his fiduciary duty to the trust and to Margaret Wimberley's estate by failing to pay rent while he lived in the Fromherz home and by using trust money to pay for utilities and incidentals for the home.

In a letter opinion on December 20, 2011, the trial court addressed other payments that James Wimberley made with family trust funds that Wesley alleged amounted to a breach of fiduciary duty, including payment of James' Costco membership and food purchases. Wesley also questioned James' deeding the Fromherz house to himself without making a distribution in kind to Wesley. The trial court determined that the payments did not amount to breaches, but were "instances of disagreement between the Trustee and the Beneficiary," and that the 2007 amendment "seemed to authorize" James to deed the house to himself.

20

On September 28, 2012, Stephen Trefts sent an initial accounting of the

Wimberley Family Trust to Wesley and James Wimberley. Trefts stated that completing

an accounting from the date of C.W. Wimberley's death would be problematic because:

> . . . we do not know what assets were held by Margaret and C.W. when C.W. died and . . . research could be very costly. Further, while there could be a case made that Jim, as Margaret's attorney-in-fact and trustee, was overreaching he in fact could have been following Margaret's instructions for distributions from the survivor's trust. Additionally it is now impossible to prove Margaret's incapacity. To further complicate matters, it is my understanding that toward the end of Margaret's life, there was a court finding that Wes was exploiting his mother financially and that he was only allowed supervised visitation. So, it may be an exercise in futility to try and recapture funds that were allegedly misused.

CP at 59-60.

In his accounting, Stephen Trefts concluded that James Wimberley should receive

a 75 percent interest in the Fromherz home and Wesley the remaining 25 percent interest:

> Margaret attempted to amend the Wimberley Family Trust to leave a 100% interest in the home to Jim. However, since a 50% interest in the home should have been placed in the [sic] C.W.'s irrevocable trust, Margaret could only leave her 50% interest in the home to Jim. Jim is also entitled to 50% of C.W.'s interest in the home (25%), for a total of 75% interest in the home. Wes is entitled to the remaining 25% interest in the home.

CP at 62. Finally, Trefts asked both brothers for additional information, including

documentation for any loans made by Margaret to Wesley, James, or others; evidence

that any contested expenses paid by James should be imposed on the estate; and tax

information for the family trust and Margaret's estate. Trefts requested a response within

21

60 days of the receipt of his letter.

Wesley Wimberley responded to Stephen Trefts' requests by November 9, 2012, but James Wimberley has yet to respond. On November 27, 2012, Richard Greiner responded on behalf of James. Greiner questioned Trefts' accounting of loans Margaret made to Wesley and his children. Greiner contended that money taken by Wesley from the home completion account at Yakima Federal Savings and Loan in December 2009 should be distributed to James, without setoff. Attorney Greiner asked why Trefts did not deduct, from Wesley's share of the assets, the $26,000 gift to Wesley in 2009.

On December 12, 2012, Stephen Trefts responded to Richard Greiner:

> 1) **Templeton [Yakima Credit Union] Account** - You have questioned whether $98,622.65 should have been moved into the Building Fund Account (YFS 45734) because Jim asserts that in the year prior to her death, Margaret moved funds from the Building Fund Account into the Templeton account.
>
> As you are aware, our stated position is that since there was no evidence that Margaret was incapacitated prior to her death, we should begin the accounting with the assets that were in Margaret's trust and estate from the time of her death forward. At the time of Margaret's death the Building Fund had cash in the amount of $2,488.77. Prior to Margaret's death, there were transfers between the various accounts and checks were written on the accounts for construction costs and also personal expenses. It is our contention that Margaret was aware of and approved of the transfers and balances, and that Jim as Trustee was also aware of the account values. Therefore, we have concluded that the balances in the accounts at Margaret's date of death are the appropriate starting balances.
>
> *As a point of interest, we have reviewed the records provided by Jim and find no evidence to support his assertion that there was a transfer of funds from the Building Fund to the Templeton Funds in 2009 in the records provided.*
>
> 2) **Loans and Gifts** - Regarding the $50,252.52 balance of the

outstanding loans which you questioned in your letter, the amount is an estimate of loans to grandchildren which would require further documentation as requested in the report accompanying our accounting. If documented, the loans to grandchildren would be assets of the estate, not liabilities to a Primary Beneficiary's share of the estate.

Regarding loans and gifts to the Primary Beneficiaries (Wes and Jim), page 48, paragraph 5 of the document states: "The Trustee shall reduce a Beneficiary's share by any gifts or loans as shown in Schedule A." There is no Schedule A, so it appears that loans and gifts made by Margaret to the Primary Beneficiaries are not chargeable against the share of either Wes or Jim.

However, we have a copy of a November 23, 1994 Court order as part of Jim's divorce settlement which assigns to Jim a total of $67,000 in debt owed to C. W. and Margaret Wimberley [*See* CP 72-77]. Since the Order predates the January 15, 1999 Wimberley Family Trust, it would not need to be added to the Schedule A and is therefore an asset of the estate and trust. We need documentation of payment of this loan.

*Another point of interest: an attempt to set aside the Schedule A required to document loans for the Primary Beneficiaries would be a daunting task. We would need to document and track loans, payments and interest. As far as gifts are concerned, the document includes as gifts "the care and maintenance, medical needs and education of any Primary Beneficiary" (page 47, paragraph 5). This would mean we would need to go back and capture not only large cash gifts such as the $26,000 gift to Wes from Yakima Federal, but also medical and other insurance payments, room and board, etc. As stated in our prior correspondence, this is not practical and would not make a difference, because while Margaret was alive she had full authority to make gifts and transfers.*

CP at 68-69.

Successor trustee Stephen Trefts set January 31, 2013, as the new deadline for James Wimberley's response to his request for information. Trefts informed James that he would file a preliminary accounting and petition for instructions if James did not timely respond. James Wimberley provided information in a January 23, 2013, response,

23

but Trefts found the information lacking and replete with meritless contentions.

On February 1, 2013, successor trustee Stephen Trefts filed a preliminary accounting and petition for instructions in Yakima County Superior Court. The trial court set a hearing for the petition on April 19, 2013. Richard Greiner withdrew as James Wimberley's attorney on March 19, 2013, and the court rescheduled the petition hearing for May 24, 2013. On May 21, 2013, James Wimberley filed a 225-page response to the preliminary accounting and petition for instructions. The response contained 200 pages of the Wimberley Family Trust's financial account history, assets, loans, and other documentation originally requested by Trefts. In a section of his response, James Wimberley asked the court to disinherit Wesley Wimberley for financially exploiting his mother, a vulnerable adult. The response asked that the trial court schedule a trial on this claim of James Wimberley.

In his February 1, 2013, petition, Stephen Trefts listed eleven instructions that he recommended the superior court deliver to him as successor trustee. The trial court agreed with the recommendations, lettered A to K, in a June 4, 2013, order approving preliminary accounting and petition for instructions. The June 4 order is the subject of this appeal. The body of the order read:

> A) That the start date for the accounting period is August 2, 2010, the date of Margaret Wimberley's death;
> B) Northwest Trustee & Management Services' accounting dated August 24, 2012 is accepted;
> C) James Wimberley shall reimburse the Wimberley Family Trust

24

(the "Trust") a sum of money in the amount of $254,437.91;

D) James Wimberley shall reimburse the Trust interest accruing from the date of the entry of this Order at the rate of 12% per annum;

E) James Wimberley shall allow Stephen Trefts and/or his agents and/or Wesley Wimberley to enter and remain on the premises located at 386 Fromherz Drive, Yakima, and/or any other real property where Mr. Trefts believes property which belonged to Margaret Wimberley may be stored. Said meetings are to be coordinated with Wes Wimberley and must be concluded no later than August 1, 2013;

F) James Wimberley shall reimburse the Trust for the fees and costs associated with bringing this petition, including reasonable attorney fees and costs;

G) James Wimberley shall pay fees accrued by Northwest Trustee & Management Services' related to its forensic accounting;

H) The deed executed by James Wimberley quitclaiming the home located at 386 Fromherz Dr., Yakima, WA to himself is hereby null and void;

I) James Wimberly [sic] shall pay the Trust rent in the amount of $800 per month for the period commencing August 2, 2010, the date of Margaret Wimberley's death;

J) This court shall issue Letters of Administration with Will Annexed to Stephen W. Trefts d/b/a Northwest Trustee & Management Services; and,

K) Petitioner has the right to amend his accounting to include newly discovered evidence, including without limitation the $67,000 debt from James Wimberley to C.W. and Margaret Wimberley as indicated on James' dissolution decree.

CP at 345.

The trial court sent the signed June 4, 2013, order, along with a letter. In its transmittal letter, the court noted:

Mrs. Wimberley's intentions appear to have ebbed and flowed over the years, and at times were contrary to or at least in conflict with the terms of the trust she and her late husband, CW, entered into in 1999. Without delving deeply into the intricacies of the Dead Man Statute, RCW 5.60.030, it is sufficient to say the trust documents manifest Mr. and Mrs.

Wimberley's intention clearly and inexplicably and it is those intentions
which govern this proceeding.

Consequently, James' objections to the accounting are rejected and
the successor Trustee's recommendations are accepted.

CP at 347. Neither the formal order nor the letter addressed James Wimberley's request

for disinheritance of Wesley Wimberley.

## LAW AND ANALYSIS

### *The Start Date of the Trust Accounting*

We now begin our review of the many objections raised by James Wimberley to

the accounting submitted by successor trustee Stephen Trefts. James Wimberley first

contends that Trefts erred in using August 2, 2010, Margaret Wimberley's date of death,

for his accounting's start date, rather than C.W. Wimberley's date of death. The trial

court, on March 2, 2012, directed successor trustee Trefts to perform an accounting

beginning on January 20, 2002, C.W.'s date of death.

Although he assigned error to the accounting's start date, James failed to deliver

any analysis, case law, or statute that supports his contention that the trial court could not

change the accounting's beginning date upon the recommendation of the successor

trustee. RAP 10.3(a)(6) provides that an appellate brief should contain "argument in

support of the issues presented for review, together with citations to legal authority and

references to relevant parts of the record." Assignments of error not argued or further

referred to in a brief are treated as abandoned by an appellant. *Talps v. Arreola*, 83

Wn.2d 655, 657, 521 P.2d 206 (1974); *Anderson v. Dep't of Labor & Indus.*, 174 Wash. 702, 705-06, 26 P.2d 77 (1933); *State v. Wilson*, 16 Wn. App. 434, 439, 557 P.2d 18 (1976). Therefore, we will not address this assignment of error.

We observe that trustee Stephen Trefts recommended the new commencement date because of the expense of reconstructing the finances of Margaret Wimberley and Wimberley Family Trust transactions. James Wimberley, in part, caused this difficulty by his refusal to furnish records to Trefts. James is thus complaining about a problem he helped to create. As successor trustee and personal representative of the Wimberley estate, Stephen Trefts had the duty to settle the estate as quickly and efficiently as possible. RCW 11.18.200; RCW 11.48.010. The trial court, under Washington's Trust and Estate Dispute Resolution Act (TEDRA), ch. 11.96A RCW possessed "full and ample power and authority . . . to administer and settle . . . all trusts and trust matters," RCW 11.96A.020, by issuing orders it deems necessary or proper in resolving a dispute. RCW 11.96A.060.

*Community Property Agreement*

James Wimberley next contends that the successor trustee erred in his accounting because the 1967 community property agreement executed by C.W. and Margaret Wimberley superseded the Wimberleys' subsequently executed wills and the initial trust instrument. Stephen Trefts based his recommendations primarily upon the Wimberley Family Trust instrument signed in 1999. According to James, if the successor trustee and

27

the trial court understood that the community property agreement remained in effect throughout Margaret Wimberley's life, the accounting and distribution of assets would change. Under James' theory, all assets not in trust at the time of C.W. Wimberley's death passed free of the trust such that Margaret could distribute those assets differently than demanded in the trust instrument. James Wimberley does not identify the assets in trust or outside of the trust at the date of C.W.'s death, but under our ruling, this identification is unimportant.

The Wimberley Family Trust instrument recognized the intention of transferring all assets owned by C.W. and Margaret Wimberley into the trust. Records show real property and financial accounts to be placed in the Trust. When the trustor is also the trustee, no formal transfer of assets from the trustor to the Trust is needed. *Samuel v. King*, 186 Or. App. 684, 64 P.3d 1206, *review denied*, 335 Or. 443, 70 P.3d 893 (2003); *Sutter v. Sutter*, 345 Ark. 12, 43 S.W.3d 736 (2001); *Taliaferro v. Taliaferro*, 260 Kan. 573, 921 P.2d 803 (1996); *Brevard County v. Ramsey*, 658 So. 2d 1190 (Fla. Dist. Ct. App. 1995). Thus, we assume that all property of the couple entered the trust in 1999, when the Wimberleys signed the trust instrument. This assumption alone terminates the effectiveness of the community property agreement upon the couple's assets.

A second document disassembles James Wimberley's argument. At the time of creating the Family Trust, C.W. and Margaret Wimberley declared their intent in a Letter of Intent and Declaration of Gift. The Letter of Intention confirmed the desire to revoke

28

the community property agreement for property held in the trust. Therefore, regardless of the language of the trust instrument, the community property agreement ended.

James advocates for a narrow interpretation of this statement to mean that C.W.'s share of any community property not held in the Wimberley Family Trust devised to Margaret upon his death. James' construction of the community property agreement, wills, and trust, is counter to the testamentary intentions of C.W. and Margaret Wimberley, and existing case law. "Community property agreements are treated as contracts, and the general rules of contract rescission apply." *Higgins v. Stafford*, 123 Wn.2d 160, 165, 866 P.2d 31 (1994). Parties to a community property agreement can therefore rescind the agreement by mutually manifested intention clearly shown. *Higgins*, 123 Wn.2d at 165; *In re Estate of Lyman*, 7 Wn. App. 945, 948, 503 P.2d 1127 (1972). In finding intent of rescission, Washington courts look to the language of written agreements, the subject matter of the agreement, and the subsequent actions of the parties. *Higgins*, 123 Wn.2d at 165. Generally, the legal effect of a subsequent contract made by the same parties and covering the same subject matter, but containing inconsistent terms, rescinds the earlier contract. *Higgins*, 123 Wn.2d at 165-66; *Bader v. Moore Bldg. Co.*, 94 Wash. 221, 224, 162 P. 8 (1917).

James Wimberley emphasizes the phrase "held by the undersigned in the Trust," in the Letter of Intention, CP at 175, as evidence that C.W. and Margaret did not have a mutually manifested intention to abandon or rescind the community property agreement.

29

We disagree for several reasons. First, this argument conflicts with the Supreme Court's analysis in *Higgins*. In that case, the Supreme Court found that a couple's mutually executed wills and will agreement rescinded a prior community property agreement, even though the couple did not explicitly state in their wills that they were rescinding it. *Higgins*, 123 Wn.2d at 169-71. It was enough that the disposition directed by the wills and community property agreement were "squarely in conflict:"

> If the community property agreement controlled, Odous took Lois' property in fee simple, immediately upon Lois' death. Taking the property in fee simple, Odous could make any testamentary disposition he desired. In contrast, if the 1977 agreement controlled, Odous was limited to the testamentary disposition identified in the wills. Because the conflicting agreements controlled the disposition of all of the Staffords' property, these agreements could not coexist. Passing the property under one agreement necessarily rendered the other agreement a nullity.

*Higgins v. Stafford*, 123 Wn.2d at 170-71.

The Wimberleys' wills and trust instrument directly conflicted with the 1967 community property agreement. We would do violence to the terms of the trust, and the intentions of C.W. and Margaret Wimberley, to hold otherwise. Also, per the terms of C.W.'s "pour over" will, his entire share of the Wimberleys' community property devised to the Wimberley Family Trust, and not to Margaret.

Second, James Wimberley's position that assets placed by Margaret Wimberley into the Wimberley Family Trust after C.W.'s death somehow remained her "separate property" is both unsubstantiated and illogical. James overlooks another provision of the

Letter of Intention that clarifies the intentions of C.W. and Margaret regarding property

placed in the Trust:

> Any property in the said Trust which had its origin as separate property, or which cannot be traced as to its origin, is the commonly owned or community property of the Trustors. *If any questions should arise, it is the intent of each of the Trustors to gift, in consideration of their mutual love and affection, so much of any disputed property to the other as is necessary to create joint ownership in both Trustors.* This gift is intended and made as and when any asset is placed into the Trust.

CP at 175 (emphasis added). The trust instruments are clear: all property placed into the

Trust became the community property of C.W. and Margaret, to be divided and

distributed pursuant to the terms of the Trust. The trial court did not err in disregarding

the community property agreement and holding that the terms of the trust control.

*The Fromherz Property and the "Building Fund"*

James Wimberley asserts that the approved trust accounting is incorrect because

(1) the accounting does not honor Margaret's wish to leave the Fromherz house entirely

to him without any offset of assets to Wesley, and (2) the accounting does not recognize

the unauthorized withdrawal from the "building fund" trust account, in Yakima Federal

Savings and Loan, by Margaret when Wesley exploited her. In so arguing, James relies

on the 2007 amendment to the trust. He also references the handwritten letter Margaret

sent to Richard Greiner, expressing her intent to leave James the house and building fund.

The relevant provisions of the 2007 amendment provided:

> Primary Residence: The Trustor's primary residence located at 386

31

Fromherz Road, Yakima Wa. and all of the surrounding property, buildings, improvements and fixtures and supporting equipment used on that property shall be distributed unto James K. Wimberley as compensation time, labor and other resources in improving the property. This distribution shall not be subject [to] offset against his share [of] the residual trust.

Further, the entire balance of the building fund account held with Yakima Federal Savings and Loan Association shall be set aside from all of the Trustor's other accounts and investments and be distributed to Jim for the purpose of finishing the ongoing work on the property. Jim shall use this fund at his sole discretion toward finishing the property and the fund shall not be offset against his share of the residual trust.

Residual Distribution: The rest, residue and remainder of the trust assets shall be divided in equal shares between Jim and Wes as forth in the trust document and shall be subject to the specific distribution set forth above.

CP at 179-80. Stephen Trefts' accounting delineated a 75-25 split of the Fromherz home and building fund between James and Wesley Wimberley respectively. Trefts arrived at this division by interpreting Margaret's 2007 amendment as devising her 50 percent interest in the two assets to James, in addition to the 25 percent interest James received under the terms of the 1999 trust instrument through his father. Under this delineation, the 1999 trust document remained binding and thus Margaret Wimberley did not control the half interest in the home previously owned by C.W. that should have been placed in one of the Decedent's Trusts upon C.W.'s death. We agree with this division.

As Stephen Trefts correctly determined, the terms of the Wimberley Family Trust did not permit Margaret Wimberley to adjust James and Wesley Wimberley's inheritance after C.W.'s death. The instrument read:

32

> The Trustors may, *during the joint lives of the Trustors*, by signed instruments delivered to the Trustee: change the beneficiaries, their respective shares and the plan of distribution; amend this Trust in any other respect; or, revoke this Trust in its entirety or any provision therein, *except as to any share or Trust created herein which has become irrevocable by the terms hereof or by operation of law.*

CP at 122 (emphasis added). The trust instrument prevented changes to the beneficiaries and distributions from the Wimberley Family Trust, unless effectuated while C.W. and Margaret both lived. Changes are prohibited when the trust, or a share of the trust, became irrevocable. 50 percent of the Wimberleys' community property held in the trust, and all of C.W.'s separate property held in trust, became unalterable upon C.W.'s passing. Margaret could not give Wesley's 25 percent interest in the Fromherz home and building fund to James, since C.W. was not alive to consent to the trust amendments. The trial court correctly approved the successor trustee's 75-25 split of the Fromherz home and building fund between the brothers.

In the alternative, James Wimberley argues that Margaret could have given a full interest in the home to him, as long as Wesley was given an equivalent value of assets from other property. James claims Margaret placed the home under the ledger of the Survivor's Trust, rather than the Decedent's Trusts. Nevertheless, James presents no evidence Margaret divided the assets of the trust upon C.W. Wimberley's death, let alone that she assigned the entire value of the home to the Survivor's Trust. The evidence

showed that Margaret violated the terms of the trust and considered all property to be under her full ownership.

*Loans Made to Wesley Wimberley and His Family*

James Wimberley argues that the successor trustee's accounting should have, but failed to, offset, from Wesley Wimberley's inheritance, loans made to Wesley and his family from Margaret or the Wimberley Family Trust. James submitted his handwritten accounting of loans made by Margaret and cancelled checks evidencing the loans with his response to the trustee's initial accounting. James contends that the Yakima Federal Savings and Loan withdrawal of $26,000 received by Wesley should be considered a loan to be deducted from Wesley's distribution of assets.

Stephen Trefts requested that James Wimberley provide documentation of loans multiple times while he prepared the initial accounting of the Trust. James submitted insufficient information. James instead bickered and dickered with Trefts about the amount of the loans, the transfer from the building fund Margaret made prior to her death, and Trefts' refusal to allocate trustee fees to James during his time as Trustee.

Under the terms of the Wimberley Family Trust instrument, all gifts and loans to be taken from either beneficiary's inheritance needed to be recorded in Schedule A. Schedule A was blank at the time of Margaret's death. Therefore, Trefts determined that loans and gifts made by Margaret to her sons were not chargeable against the share of either Wesley or James. We agree with the successor trustee's handling of the loans and

therefore affirm the trial court's approval of this handling. We note, as did Stephen

Trefts, that James' contention may be self-defeating since he likely received more gifts

and loans than his brother.

Stephen Trefts also correctly determined that a loan to Wesley's son Aaron for

$37,802.52 at three percent interest is a trust asset, and not an offset against Wesley's

inheritance. The Wimberley Family Trust provided that the trustee could give money for

support and education to be charged against the receiving beneficiary's inheritance, and

that the provision "shall also apply to the issue of a deceased Primary Beneficiary." CP

at 158. This language indicated that loans or gifts made to grandchildren will not count

against the beneficiary-parent's share of the trust distribution, unless the beneficiary

predeceases their issue. Wesley cosigned on the loan to Aaron and will be responsible

for repaying the loan if Aaron does not.

*James Wimberley's Reimbursement of the Trust with Interest*

James Wimberley contends that the trial court erred in ordering him to repay the

Trust $254,437.91. When ordering the reimbursement, the trial court ascertained

Margaret Wimberley's intent regarding which withdrawals from the trust accounts should

be characterized as James' personal expenses rather than trust expenses. In this context,

we apply the substantial evidence standard of review. Determining the parties' intent in

regard to a trust is a factual question. *Niemann v. Vaughn Cmty. Church*, 154 Wn.2d 365,

374-75, 113 P.3d 463 (2005). We review factual questions under a substantial evidence

35

standard, determining whether the evidence was sufficient to persuade a rational fair-minded person the premise is true. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000); *In re Riddell Testamentary Trust*, 138 Wn. App. 485, 491-92, 157 P.3d 888 (2007).

Successor trustee Stephen Trefts identified $254,437.91 of personal expenses that James charged to the Wimberley Family Trust account. Some of the expenses result from James Wimberley, while trustee, failing to pay Wesley Wimberley his 25 percent interest in the Fromherz house. While trustee, James paid for groceries, tires, car insurance, and his personal phone bill from trust funds. The trial court agreed with Trefts' accounting, noting that "the trust documents manifest Mr. and Mrs. Wimberley's intention clearly and inexplicably and it is these intentions which govern this proceeding." CP at 347.

Substantial evidence supports the trial court's findings. The estate planning documents and testimony from most witnesses established that Margaret Wimberley did not intend for James Wimberley to take such a large portion of the Trust's assets or to charge personal expenses to the family trust. The trust assets were to be divided 50-50. Charging personal expenses to the trust contradicts this division.

James Wimberley had ample opportunity to supplement Stephen Trefts' accounting with his own documentation of trust versus personal expenses. James chose to wait until three days before the trial court hearing on the accounting to produce

36

incomplete, self-serving evidence that omitted benefits he received from Margaret while living in her house. Wesley Wimberley aptly stated: "The preliminary accounting is as accurate as Jim allowed it to be." Br. of Resp't Wimberley at 25. The trial court did not err in ordering James Wimberley to reimburse the Trust $254,437.91.

The trial court correctly ordered James Wimberley pay twelve percent interest on the money he must reimburse the Trust. RCW 4.56.110(4) provides that judgments shall bear interest from the date of entry, at the maximum rate permissible under RCW 19.52.020. Under RCW 19.52.010, interest accrues on debts at twelve percent interest per annum when the parties fail to reach an agreement as to the amount of interest. James provides no argument on appeal as to why twelve percent per annum is improper.

*Allocation of Attorney and Accounting Fees*

James Wimberley contends that he should not be ordered to reimburse the Wimberley Family Trust for attorney fees and costs associated with bringing the petition for approval of the preliminary accounting and instructions, or the fees incurred by Stephen Trefts in preparing a forensic accounting of family trust activity. He argues: (1) Wesley Wimberley is responsible for the present action as he has complicated the administration and distribution of the Trust, and (2) James incurred fees acting as trustee and personal representative and is entitled to receive compensation for his services.

Washington's Trust and Estate Dispute Resolution Act (TEDRA) allows superior or appellate courts in Washington to order:

37

costs, including reasonable attorneys' fees . . . to any party: (a) From any party to the proceedings. . . . The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

RCW 11.96A.150(1). This court reviews a trial court's decision to award fees under TEDRA for abuse of discretion. *Bale v. Allison*, 173 Wn. App. 435, 461, 294 P.3d 789 (2013); *In re Estate of Black*, 153 Wn.2d 152, 173, 102 P.3d 796 (2004). In determining whether an award of attorney fees is appropriate, the trial court must consider whether the litigation and the participation of the party seeking attorney fees caused a benefit to the trust. *Allard v. Pac. Nat'l Bank*, 99 Wn.2d 394, 407, 663 P.2d 104 (1983).

Successor Trustee Stephen Trefts sought reimbursement from James Wimberley for attorney fees the family trust incurred as a result of petitioning the trial court for approval of the accounting and for instructions. Trefts wished to avoid the petition and consistently informed James that his failure to respond with needed information would result in litigation. Trefts' petition benefitted the trust because it expedited the administration of a trust prolonged for three years by James' mismanagement and self-dealing with trust funds, and his unwillingness to cooperate with Trefts' subsequent management of the trust. Therefore, the trial court did not abuse its discretion in ordering James to pay the trust the monies it spent in petitioning the court.

The trial court also did not exceed its discretion when ordering James Wimberley to pay Stephen Trefts' accountant fees in preparing the forensic accounting for the Wimberley Family Trust because the court found the accounting accurate. *In re Estate of Cooper*, 81 Wn. App. 79, 93, 913 P.2d 393 (1996). In *Cooper*, this court affirmed a trial court's proportional award of attorney and accountant's fees to a trustee-father and his beneficiary-children. 81 Wn. App. at 97. The court determined that the award was justified as a benefit to the estate because the trial court found that the accounting accurately traced the estate's assets. *Cooper*, 81 Wn. App. at 93.

### *James Wimberley's Self-Deeding of the Fromherz Residence*

James Wimberley contends that the trial court erred in voiding the June 28, 2011, deed, by which he conveyed the Fromherz home to himself. Although he assigns error to this aspect of the court's June 4, 2013 order, he presents no argument in his brief. Rather, he requests that this court order the successor trustee to effectuate the intent of Margaret Wimberley by transferring to him his 100 percent interest in the Fromherz Road property. We already affirmed the trial court's ruling that James holds only a 75 percent interest.

A court of equity has jurisdiction to reach the property either in the hands of the original wrong-doer, or in the hands of a subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust. *Rennebohm v. Rennebohm*, 153 Wash. 102, 108, 279 P. 402 (1929). The 2007 amendment of the Trust was ineffective in conveying James 100 percent of the

39

Fromherz home. When James deeded the property to himself in 2011, he withheld from Wesley the 25 percent interest he owned. Wesley's interest is worth $75,000 or one-fourth of the home's value of $300,000. The trial court wisely voided the quitclaim deed and returned the house to the trust, so that successor trustee Stephen Trefts could effect a fair and proper distribution.

### *Payment of Rent for Residing in the Fromherz Home after Margaret's Death*

James Wimberley next contends that the trial court erred in ordering him to pay the Trust $800 rent per month from the date of Margaret's death. As with some other assignments of error, James omits substantive argument that the $800 rental amount is inaccurate or improper. Instead, he relies on the ineffective provisions of the 2007 amendment as support for his contention that he received 100 percent interest in the Fromherz home. We already ruled to the contrary.

As the trial court found in its order removing James Wimberley as trustee, *In re Estate of Jones*, 152 Wn.2d 1, 93 P.3d 147 (2004), controls here. In that case, a personal representative resided in his deceased mother's home, deeding the property to himself after living there for a year without distributing the shares to his three brothers. 152 Wn.2d at 12. The Supreme Court found that the personal representative breached his fiduciary duty by "possessing the house in an individual capacity before the estate was closed." *Jones*, 152 Wn.2d at 12. An executor may possess and control property while administering an estate, if he posts bond. RCW 11.48.020. However, when a person's

40

right to possession of the property arises from his status as executor, he does not have a right to use the property when there are other reasonable alternatives open, such as renting the property. *Jones*, 152 Wn.2d at 14. If the personal representative resides in the house and uses it for his own benefit, he must pay rent. *Jones*, 152 Wn.2d at 14.

Until distribution of each brother's share in the home, the Fromherz home remained the property of the Wimberley Family Trust. James should have paid the trust rent while the estate was in the process of settling.

*Consideration of a $67,000 Debt from James Wimberley that Pre-Dates the Trust*

James Wimberley contends that the trial court erred in allowing the successor trustee to amend his accounting to include newly-discovered information, including a $67,000 debt owed by James to C.W. and Margaret, mentioned in an exhibit attached to James' divorce decree, filed November 23, 1994. James raises the defenses of laches and the statute of limitations against the trustee's enforcement of the debt against him. Under RCW 4.16.040, the limitation period for a debt in writing is six years.

An action to collect an unpaid debt is barred once the statute of limitations has run. *In re Receivership of Tragopan Props., LLC*, 164 Wn. App. 268, 270, 263 P.3d 613 (2011). However, the clock resets once the promisor executes a new writing expressly acknowledging the debt or promising to pay it. *Fetty v. Wenger*, 110 Wn. App. 598, 602, 36 P.3d 1123 (2001). If this acknowledgement occurs after the statute of limitations has run, then it must be strictly construed, and any subsequent action must be brought on the

41

newly executed instrument. *Tragopan*, 164 Wn. App. at 274. Also, a partial payment extends the limitation period another six years. *Wickwire v. Reard*, 37 Wn.2d 748, 759, 226 P.2d 192 (1951).

The statute of limitations likely bars an action against James Wimberley to recover the $67,000 debt mentioned in his 1994 divorce decree. Assuming the debt accrued in 1994, James is correct that any action to enforce the debt, absent evidence of a clear acknowledgement of it after November 23, 2000 or partial payment, is barred by the statute of limitations. RCW 4.16.040. Nevertheless, James is inconsistent. He argues that his debt is barred by the statute of limitations or laches, but he seeks to enforce a debt owed by Aaron Wimberley and received on October 6, 2006.

The statute of limitations likely bars the Wimberley Family Trust from enforcing either James Wimberley's or Aaron Wimberley's debts. Nevertheless, Stephen Trefts, as successor trustee, holds authority to explore whether either debtor paid a portion of the debt or confirmed the debt in a new writing and thereby prolonged the limitation period. We affirm the trial court's ruling with the caveat that, if the successor trustee finds no evidence of the extension of the statute of limitations or payment within the limitation period, he take no action to collect the debt.

*Assigning for Trial the Claim that Wesley Wimberley Should be*

*Disinherited as an Abuser*

Finally, James Wimberley asserts that the trial court erred in refusing to assign for

42

trial the claim that Wesley Wimberley should be disinherited as an abuser under

Washington's slayer and abuser statute, chapter 11.84 RCW. Wesley contends that this

reviewing court should ignore the assignment of error, because the claim was not

properly pled before the trial court. We agree with Wesley.

RCW 11.96A.100(5), a section of TEDRA, provides that in a trust dispute:

> The answer to the petition and any counterclaims or cross-claims
> must be served on the parties or the parties' virtual representatives and filed
> with the court at least five days before the date of the hearing.

RAP 2.5(a) provides that this court may refuse to review any claim of error that was not

properly raised before the trial court.

James Wimberley filed a 225-page response to the trustee's petition on May 21,

2013, two days before the scheduled hearing on Stephen Trefts' petition to approve the

accounting and for instructions. The response raised for the first time a claim that

Wesley Wimberley abused his mother by accompanying her to the bank while she

transferred funds to different accounts. The trial court was correct in ignoring this late

request.

## CONCLUSIONS

We affirm all rulings of the trial court in its June 4, 2013, order, with one caveat.

Unless the successor trustee discovers any partial payment or written promise to pay by

James Wimberley on the loan owed to his parents within the last six years, the trustee

43

should not pursue collection of the debt. The same caveat applies to the debt owed by

Aaron Wimberley.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Brown, J.