IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of: THE BERNICE K. PRICE-CAMERON TRUST, | ) ) ) | No. 79328-4-I (Consolidated with No. 79329-2-I |
| MARCUS E. PRICE, Co-Trustee of the Bernice K. Price-Cameron Trust, | ) ) ) ) | DIVISION ONE UNPUBLISHED OPINION |
| Appellant, | ) ) | |
| v. | ) ) | |
| ANTOINETTE S. PRICE, Co-Trustee of the Bernice K. Price-Cameron Trust and in her representative capacity as Attorney-in-Fact for Bernice K. Price-Cameron, | ) ) ) ) ) ) ) | |
| Respondent. | ) ) | |

HAZELRIGG, J. — Marcus Price seeks reversal of a vulnerable adult protection order (VAPO) protecting his mother, Bernice Price-Cameron, and reversal of an order removing him as co-trustee of her revocable living trust, requiring him to provide an accounting of trust income and assets, and imposing damages under the Trust and Estate Dispute Resolution Act (TEDRA).[1] He argues that the court exceeded the permissible scope of relief at the initial hearing on the TEDRA petition and that the findings and conclusions on both the VAPO and the TEDRA orders were not supported by the record. Because the record contains

---

[1] Chap. 11.96A RCW.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

substantial evidence of financial exploitation of the vulnerable adult and the court did not exceed its broad authority under TEDRA by resolving all issues of fact and law at the initial hearing, we affirm.

FACTS

In 1998, Bernice Price-Cameron created a revocable living trust and listed herself as the sole beneficiary during her lifetime. She initially named herself trustee, but the trust provided that her son Justin Price and her daughter Antoinette Price would serve as co-trustees in the event that she became unable to perform that role. The trust relieved the trustee of "duties which would otherwise be required by state law relating to accountings by Trustees" but provided that "Trustees shall furnish to present beneficiaries . . . a statement of accounting of administration upon reasonable request to do so." On the same day, Bernice[2] also executed a durable power of attorney appointing Antoinette as her attorney-in-fact. Bernice transferred her home and a 12-unit apartment building in Seattle, Price Catalina Apartments, to the trust in 1999.

Bernice's mental and physical condition deteriorated after she suffered two strokes in 2005. She was no longer able to live independently, so her son Marcus Price moved into her home. Marcus took over the management of Bernice's day-to-day finances and of Price Catalina Apartments. His rate of compensation as property manager was 10% of the gross receivables from the apartment building per month.

---

[2] For clarity, the parties will be referred to by their first names. No disrespect is intended.

In February 2007, Bernice executed an amendment to the trust in which she modified the article naming successor trustees. After the amendment, the trust provided that Antoinette and Marcus would serve as co-trustees in the event of Bernice's death, incapacity, or resignation. In June 2007, Bernice was determined to have severe cognitive impairment.

In 2016, damage from a fire in Bernice's home forced Bernice and Marcus to move out of the residence. Marcus moved into a house that he had purchased in September 2015. Bernice first moved in with Antoinette in California and then into an assisted living community nearby. In 2017, Bernice's doctors believed that she had dementia, that she lacked mental capacity, and that she was unable to care for herself or make decisions unassisted.

Antoinette requested accountings and information about the trust properties from Marcus over a period of several years leading up to the summer of 2018, but he did not provide the information. On June 1, 2018, Antoinette's attorney sent a letter to Marcus' attorney demanding copies of the keys, lease agreements, tenant deposits, mortgage statements, insurance policy, and laundry account information for Price Catalina Apartments. Later that month, under her authority as Bernice's attorney-in-fact, Antoinette closed all of the bank accounts that Bernice held jointly with Marcus and in the name of the Price Catalina Apartments. The total amount in those accounts when they were closed was less than $30,000.

Marcus' attorney responded that Antoinette was improperly interfering in the administration of the trust, of which Marcus was co-trustee, and threatened legal action if she continued. Antoinette had not been provided a copy of the 2007

amendment and did not know that Marcus had been substituted as co-trustee. She responded through counsel that she was still entitled to an accounting as co-trustee and requested information about rental income from the Price Catalina Apartments. Marcus did not respond.

On August 5, 2018, Antoinette filed a petition for a VAPO under King County Superior Court case number 18-2-19648-5 SEA seeking to restrain Marcus from physically or financially abusing Bernice, contacting her, or visiting her home. The petition also sought an accounting of Bernice's income or other resources. The court granted a temporary restraining order imposing the temporary relief requested and requiring Marcus to provide Antoinette with an accounting of the rental income from Price Catalina Apartments from January 1, 2018 to July 31, 2018 by the date of the hearing on the petition. Marcus did not file any responsive pleading before the hearing.

At the first VAPO hearing, Marcus appeared pro se and indicated he had not yet been able to retain legal counsel. The court placed Marcus under oath and questioned him about the apartment building's expenses. Marcus testified that the gross receivables for the apartment building were about $15,000 to $18,000 per month. He indicated that the net revenue was about $8,000 per month after paying approximately $2,000 for utilities, $800 for insurance, $2,800 in property taxes, and $600 toward the mortgage. The court pointed out that if the building was bringing in $9,000 to $12,000 per month, then the building should have over $1,000,000 in revenue from the previous ten years. Marcus responded that rents and property taxes had not been consistent over the past ten years and that he had performed

significant upgrades and repairs on the building.[3]  The court reissued the temporary restraining order and required Marcus to provide tenant information, leases, a list of expenses for the building, and Beatrice's tax returns to Antoinette's attorney within ten days of the order.

About three weeks later, the day before the next hearing, Antoinette's counsel filed a declaration stating that Marcus had provided the list of tenants and leases but had not provided the list of expenses or the accounting required by the previous order.  Marcus had indicated to her through counsel that he was still in the process of compiling the accounting.  At the hearing, he argued that he was struggling to put together an accounting because the Bank of America account that had been closed contained his notes regarding the purpose of the transfers and because many of his records were at Bernice's house, which the temporary order prevented him from entering.  Antoinette requested that Marcus be temporarily removed as co-trustee because the conflict between the parties was impacting Beatrice.

The court reissued the temporary VAPO and ordered Marcus to provide a list of expenses for the apartment building and copies of Bernice's tax returns to Antoinette's attorney.  The temporary VAPO was modified to allow Marcus access to Bernice's residence for the purposes of retrieving this documentation.  The reissuance also allowed Marcus visitation with Bernice twice per week.  The court declined to remove Marcus as co-trustee but suspended his powers until further order of the court, explaining that he would not "have the power to act anymore,

_____

[3] The transcript of the hearing provided to this court as part of the record on appeal is incomplete and ends after this response.

- 5 -

but . . . would have . . . the right to receive information." The order set a new deadline for the accounting three days before the next hearing.

On October 10, 2018, Marcus filed a declaration with 200 pages of attached exhibits including bank statements, receipts, invoices, bills, copies of checks, and other documentation. He stated that he had been the caregiver for Bernice and for his brother Keith since 2005. He also began taking care of his brother Justin in 2014. Marcus asserted that Bernice's properties were heavily mortgaged on unreasonable terms when he began helping her with her finances in the mid-1990s. He stated that he had "always strongly believed [his] mom's mortgages needed to be paid down" and had "done so regularly on all properties, including the Price Catalina Apartments." His siblings disagreed with this idea because "[t]hey all feel the income that has been used to pay down debt should actually be distributed to the siblings."

Marcus stated that the $75,000 withdrawal in July 2017 was used for a $55,000 payment to the general contractor rebuilding Bernice's house after the fire, and the remaining $20,000 was paid to Washington Federal Credit Union as part of the refinance of a mortgage that would otherwise have ballooned that summer. He asserted that Antoinette had decided to make unnecessary upgrades to the house while the fire damage was being repaired that were not covered by insurance and cost approximately $40,000. He also stated that Antoinette had put Bernice in an unsatisfactory care facility in California when the family believed that Bernice was staying at Antoinette's home and that she paid for the facility using about $15,000 of "funds that were meant for the rebuild."

Marcus asserted that he had responded to Antoinette's requests for an accounting by telling her that "getting together all of the books would have to wait until the house rebuild was finished because that was such a time consuming and constantly changing issue" and he "was already overwhelmed and couldn't handle another task." When Antoinette closed or removed his access to his mother's accounts, he had to front payments on his credit card and reimburse himself for "necessary purchases for the rebuild and apartments." He asserted that "[t]his also made it extremely difficult to try to put together a coherent accounting of the past year" because his notes on the transactions in the online accounts were lost when the accounts were closed.

Marcus also stated that he had reason to believe that Antoinette should not serve as the sole trustee. He asserted that the trust had also contained a third property at one point, but Antoinette had quit claimed the property to herself without any compensation to the trust, collected rent from the property for a few years, and then sold the property without returning the proceeds to the trust. He attached a deed conveying a property from the trust to Antoinette Dickson for $10, apparently signed by Bernice and notarized on November 25, 2002.

Marcus stated in his declaration that,

> I categorically deny the allegations being made by my sister. She has nothing supporting her claims other than her self-serving suspicions. I was put in a very difficult position where I had to manage the apartment building, I had to deal with a complicated and very time consuming fire claim, and I had to deal with a balloon payment on my mom's house mortgage, all while I was being the sole caretaker of my two disabled brothers who still live with me.

On October 12, 2018, Antoinette filed a separate petition against Marcus under King County Superior Court case number 18-4-06062-9 SEA seeking relief under TEDRA. She sought permanent removal of Marcus as co-trustee, an order requiring Marcus to provide "a full and complete inventory, forensic accounting completed by a certified forensic accountant, and report for all activities performed as Co-Trustee of the Trust." The petition also requested an order "permitting limited discovery, and setting a schedule for completion of limited discovery and that, following limited discovery, the Court issue an order for mediation." The petition indicated that, "[i]f mediation is unsuccessful," Antoinette would ask that the matter be set for trial and seek additional relief. This additional relief included an order permitting full discovery, an order finding that Marcus had breached his fiduciary duty to the trust and assessing damages as a result of the breach, and an award of attorney fees and costs.

The same day, the parties appeared in court for another hearing on the VAPO petition. The court reissued the temporary VAPO with the condition that Marcus hire a forensic accountant. Antoinette also informed the court that she had filed the TEDRA petition and asked the court to retain jurisdiction on that matter. The court agreed to do so. A hearing on both matters was set for November 9, 2018.

A week before the scheduled hearing, Marcus filed a motion to stay the proceedings under both case numbers. He argued that the court should grant a stay to protect his Fifth Amendment privilege against self-incrimination because the Seattle Police Department was investigating his management of the trust.

- 8 -

Antoinette opposed the stay. Her attorney filed a declaration asserting that she had spoken with a detective who indicated that there were no pending criminal charges against Marcus. The detective stated that a prosecutor had advised her to wait for the completion of the accounting before conducting any further investigation in the criminal matter. Antoinette requested that the court (1) deny the stay, (2) find that Marcus had breached his fiduciary duties by failing to account for trust assets valued at $313,307.79, (3) find that Marcus had committed financial exploitation of a vulnerable adult, (4) enter judgment removing Marcus as co-trustee, (5) impose damages in the amount of $313,307.79, (6) order Marcus to pay Antoinette's reasonable attorney fees, and (7) order Marcus to account for and deliver any trust assets in his possession or control to Antoinette. Marcus did not file any other answer or responsive pleading to the TEDRA petition or VAPO petition.

The court heard both matters on November 9, 2018. It considered the VAPO petition first. Through counsel, Marcus indicated that he had retained a bookkeeper to prepare documents to be provided to a forensic accountant, but the forensic accountant had not been hired and the process was "still ongoing." The court heard argument on the motion for a stay of proceedings, considered the King v. Olympic Pipeline Co.[4] factors on the record, and made the following ruling:

> I've read through all the materials on the VPO. I think that the petitioner has readily met her burden in this matter and I don't think, as I've just gone through the Olympic [Pipeline] factors, that a stay is warranted in the VPO. So I'm going to enter the order for protection in the VPO matter.

---

[4] 104 Wn. App. 338, 16 P.3d 45 (2000).

The court found "[b]y clear, cogent, and convincing evidence" that Marcus had "committed acts of abandonment, abuse, personal exploitation, neglect, and financial exploitation of the vulnerable adult." The VAPO restrained Marcus from acts or threats of harm or abuse against Bernice, excluded him from her residence, and required him to provide a forensic accounting. The VAPO also limited Marcus' contact with Bernice to three-hour visits twice per week.

The court conducted the hearing on the TEDRA petition that afternoon. It first considered whether it was able to grant relief under TEDRA at the initial hearing. The court noted that, if a party had asked for mediation, it would "kick the whole thing out and say 'go mediate.'" It stated its impression that Antoinette's reference to mediation in her petition was "forward thinking" because she was "saying she's going to [ask for mediation] after limited discovery is done." The court asked Antoinette to clarify whether she was "actually making the request now for mediation" and she responded that she was not. Marcus indicated that he would ask for mediation if the court denied his request for a stay, and the court responded,

> And he'd have that right, but he has that right—I mean, he can—he can file his notice for mediation immediately. . . . [W]e are still going to talk about whether or not . . . she's entitled to the relief that she's seeking at this initial hearing . . . because, as both sides have acknowledged, that was not otherwise requested. So the default is I decide everything.

After considering the Olympic Pipeline factors as they applied to the TEDRA case, the court denied Marcus' request for a stay and indicated that it would "protect Mr. Price's Fifth Amendment rights by ensuring that there is no discovery personally as to him." Marcus then made an oral request for mediation. The court

- 10 -

responded that the applicable statute required a party to request mediation three days before a hearing, "but if you haven't raised that issue until the hearing itself, then we don't just suddenly stop the hearing . . . and do that, but tomorrow he can file a notice and off you go to mediate."

The court then turned to the merits of the TEDRA petition. It acknowledged that there had not been a "written opposition" to the petition but that it would "hear from counsel and he can tell me what he opposes orally." Marcus argued that the court should not provide the requested relief because he was still attempting to compile the requested documentation. The court noted that Marcus had been ordered to turn over his documentation to a forensic accountant but instead chose to hire a bookkeeper. Marcus next argued that Antoinette had not provided full documentation of all of the funds she claimed were missing. After hearing argument on the appropriate amount of damages, the court ruled:

> I'm resolving the issues of two things: [o]ne[,] this $45,450.91 unaccounted for in regards to the Farmers Insurance proceeds; two, the documentary evidence right now shows that there is $129,276.38 in rental income that I don't think has been accounted for. I'm changing the $313,307.79 to $174,727.29.
> Now, I want to make clear to both parties because this cuts both ways. This is not resolving all the funds that the co-trustee thinks he took. This is also not accounting for all the funds that he thinks he can explain where he spent.

The court entered an order removing Marcus as co-trustee, awarding $174,727.29 in damages to Antoinette in her representative capacity as trustee, requiring Marcus to turn over all trust documents and property, making Marcus responsible for the costs of obtaining an accounting in an amount to be approved

by the court, and awarding Antoinette reasonable attorney fees and costs. The order was corrected and refiled on November 13, 2018.

On November 26, 2018, Marcus filed a pro se motion for reconsideration or, in the alternative, to alter or amend the order under CR 52, 59, and 60 in the TEDRA case. His memorandum in support of the motion argued that the findings were not supported by substantial evidence, his removal as co-trustee was not justified because he did not breach his fiduciary duty, the monetary award was excessive, attorney fees were unwarranted, and the court erred in entering the VAPO. He also filed the same declaration and exhibits that he had filed in the VAPO action. On December 27, 2018, he filed a second memorandum in support of his motion for reconsideration after again retaining counsel. The memorandum included an explanation that most of the insurance proceeds had been disbursed directly to vendors rather than to Marcus and a summary of the documents in his previously-filed declaration showing the disposition of the rental income. He also filed a supplemental declaration explaining the charges in the summary.

The court found that Marcus had not shown that any of the documents filed in support of his motion "constituted newly discovered evidence which with reasonable diligence he could not have discovered and produced at or prior to the November 9, 2018 hearing." The court concluded that Marcus had not established grounds for reconsideration of the order and denied the motion. Marcus appealed.

ANALYSIS

I.  Vulnerable Adult Protection Order

Marcus argues that the court erred in finding that he had committed acts of abandonment, abuse, personal exploitation, neglect, and financial exploitation of Bernice and in entering the VAPO.

Appellate courts review a superior court's decision to grant or deny a petition for a vulnerable adult protection order for abuse of discretion. In re Knight, 178 Wn. App. 929, 936, 317 P.3d 1068 (2014).  A court abuses its discretion when its exercise of discretion is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).  Factual findings are reviewed for substantial evidence. Knight, 178 Wn. App. at 936.  Substantial evidence is that which is "sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).  "We defer to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony." Knight, 178 Wn. App. at 937.

In enacting the "Abuse of Vulnerable Adults Act" (AVA), the legislature found that "[s]ome adults are vulnerable and may be subjected to abuse, neglect, financial exploitation, or abandonment by a family member, care provider, or other person who has a relationship with the vulnerable adult." RCW 74.34.005.  A vulnerable adult or an interested person on their behalf may seek relief from such "abandonment, abuse, financial exploitation, or neglect, or the threat thereof," by petitioning for a protection order. RCW 74.34.110(1).  The petition must allege that

"the petitioner, or person on whose behalf the petition is brought, is a vulnerable adult" and that the allegedly vulnerable adult "has been abandoned, abused, financially exploited, or neglected, or is threatened with abandonment, abuse, financial exploitation, or neglect by respondent." RCW 74.34.110(2). The court is empowered to order relief "as it deems necessary for the protection of the vulnerable adult." RCW 74.34.130. The definition of "vulnerable adult" includes a person who is 60 years of age or older and has the functional, mental, or physical inability to care for themselves. RCW 74.34.020(22)(a).

The AVA does not state the standard of proof required to enter a VAPO. Knight, 178 Wn. App. at 938. When the vulnerable adult opposes the petition, the court must find both that the adult is vulnerable and that the VAPO is needed by clear, cogent, and convincing evidence. Id. at 937, 940. However, in most other instances, "[t]he proper standard of proof involving abuse of a vulnerable adult under chapter 74.34 RCW is a preponderance of the evidence." Kraft v. Dep't of Soc. & Health Servs., 145 Wn. App. 708, 716, 187 P.3d 798 (2008).

The VAPO contains the finding that Marcus had "committed acts of abandonment, abuse, personal exploitation, neglect, and financial exploitation of the vulnerable adult."

The statutory definition of "financial exploitation" is as follows:

> (7) "Financial exploitation" means the illegal or improper use, control over, or withholding of the property, income, resources, or trust funds of the vulnerable adult by any person or entity for any person's or entity's profit or advantage other than for the vulnerable adult's profit or advantage. "Financial exploitation" includes, but is not limited to:
> (a) The use of deception, intimidation, or undue influence by a person or entity in a position of trust and confidence with a vulnerable

adult to obtain or use the property, income, resources, or trust funds of the vulnerable adult for the benefit of a person or entity other than the vulnerable adult;

(b) The breach of a fiduciary duty, including, but not limited to, the misuse of a power of attorney, trust, or a guardianship appointment, that results in the unauthorized appropriation, sale, or transfer of the property, income, resources, or trust funds of the vulnerable adult for the benefit of a person or entity other than the vulnerable adult; or

(c) Obtaining or using a vulnerable adult's property, income, resources, or trust funds without lawful authority, by a person or entity who knows or clearly should know that the vulnerable adult lacks the capacity to consent to the release or use of his or her property, income, resources, or trust funds.

RCW 74.34.020. There is substantial evidence in the record to support this finding. Marcus was co-trustee and the manager of Bernice's apartment building, and he managed her day-to-day finances. The record showed a lack of funds in Bernice's accounts despite consistent income from the apartment building and a sizeable insurance payout. The record supports a conclusion that Marcus did not provide an adequate explanation of how those funds had been disposed. Antoinette asserted that Marcus had purchased vehicles, travel, and real estate in the past several years when his only job was managing the apartment building. The evidence in the record is sufficient to show that Marcus mismanaged trust funds and assets for his own benefit, which supports a finding of financial exploitation.

The AVA authorizes imposition of a VAPO if the court finds that the vulnerable adult requires protection from "abandonment, abuse, financial exploitation, or neglect, or the threat thereof." RCW 74.34.110(1). The statutory scheme allows the court to impose the VAPO if any one of these circumstances is present and does not require evidence of every form of mistreatment listed. Because there was substantial evidence supporting the finding of financial

exploitation and this finding supports the conclusion of law that the relief ordered was necessary for Bernice's protection, we affirm the imposition of the VAPO.

Marcus also argues that, even if we find that there was substantial evidence of financial exploitation, the finding does not support imposition of restraints limiting his contact with Bernice. He contends that these restraints were not necessary for Bernice's physical protection and therefore the court abused its discretion.

If a court finds that abuse, neglect, or exploitation has occurred, the court may order relief "as it deems necessary for the protection of the vulnerable adult." RCW 74.34.130. That relief is designed to protect against "abandonment, abuse, financial exploitation, or neglect, or the threat thereof." RCW 74.34.110(1). Marcus contends that the restraints were not necessary because "there are no allegations or evidence that Ms. Price-Cameron is in any danger or peril from having contact with Marcus." However, a reasonable reading of the relevant statutes suggests that the superior court may order relief as it deems necessary to protect the vulnerable adult not only from physical danger, but from any abandonment, abuse, financial exploitation, or neglect, or the threat thereof.

As noted above, there is substantial evidence for the court's finding that Marcus committed financial exploitation of Bernice. The court did not abuse its discretion in deeming limited contact with Marcus necessary for Bernice's protection from further financial exploitation, especially in light of Marcus' failure to oppose the scope of the VAPO below.

II.    TEDRA Proceeding

A.    Scope of Relief

Marcus contends that the court exceeded the permissible scope of relief in entering the order in the TEDRA action.  Marcus argues that the court lacked statutory authority to enter the money judgment at the initial TEDRA hearing because Antoinette had not requested the award in her petition.

We review questions of law and statutory construction de novo. In re Estate of Jones, 152 Wn.2d 1, 8–9, 93 P.3d 147 (2004).  When determining the meaning of a statute, the appellate court's objective is to ascertain and carry out the legislature's intent. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9–10, 43 P.3d 4 (2002).  "When possible, the court derives legislative intent from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole." Columbia Riverkeeper v. Port of Vancouver USA, 188 Wn.2d 421, 432, 395 P.3d 1031 (2017).

The legislature's stated intent in enacting TEDRA was to provide the courts with "full and ample power and authority" to administer and settle all trust matters. RCW 11.96A.020.  If TEDRA is "inapplicable, insufficient, or doubtful with reference to the administration and settlement" of trust matters, "the court nevertheless has full power and authority to proceed with such administration and settlement in any manner and way that to the court seems right and proper, all to the end that the matters be expeditiously administered and settled by the court."

RCW 11.96A.020(2). The initial hearing on a TEDRA petition "must be a hearing on the merits to resolve all issues of fact and all issues of law" unless a party "requested otherwise" in a petition or answer. RCW 11.96A.100(8).

Marcus contends that the court should have ordered the parties to participate in mediation rather than resolving the issues on the merits because Antoinette requested mediation in her petition. A party to a TEDRA proceeding may "cause the matter to be subject to mediation by service of a written notice of mediation on all parties." RCW 11.96A.300. When a hearing has already been set, the statute detailing mediation procedures under TEDRA requires that the notice of mediation be served at least three days before the hearing in substantially the following form:

> NOTICE OF MEDIATION UNDER RCW 11.96A.300
> To: (Parties)
> Notice is hereby given that the following matter shall be resolved by mediation under RCW 11.96A.300:
> (State nature of matter)
> This matter must be resolved using the mediation procedures of RCW 11.96A.300 unless the court determines at the hearing set for . . . o'clock on . . . . . , (identify place of already set hearing), that mediation shall not apply pursuant to RCW 11.96A.300(3). If the court determines that mediation shall not apply, the court may decide the matter at the hearing, require arbitration, or direct other judicial proceedings.
> (Optional: Our list of acceptable mediators is as follows:)
>         DATED: . . . . . .
>         . . . .
>         (Party or party's legal representative)

RCW 11.96A.300(1)(b). Division Two of this court found no substantial compliance with this form where a notice of mediation did not include language advising the opposing party that the matter must be resolved using mediation procedures of RCW 11.96A.300(1)(a) unless the party objected, that the party could object, how

to object, or how to nominate proposed mediators if he did not object. In re Estate of Harder, 185 Wn. App. 378, 383–84, 341 P.3d 342 (2015).

Here, neither party served a notice of mediation at least three days before the hearing that substantially complied with the form mandated by TEDRA. Despite the reference to potential mediation in Antoinette's amended petition, it did not contain a present notice of mediation when stating that, "[u]pon the completion of limited discovery, Petitioner will request that the court order mediation pursuant to a notice for mediation that will be filed under RCW 11.96A.300." Although it contemplated a future notice of mediation, this document did not purport to be a notice of mediation nor did it contain essential portions of such a notice.

The court did not err in determining that neither party had properly requested mediation at the time of the hearing. Antoinette did not include in her petition a request for mediation that substantially complied with the form mandated by TEDRA. She also reiterated at the hearing that she had not requested mediation. However, her petition did include all the relief she sought. The court did not err in exercising its broad discretion under TEDRA to settle all issues of fact and law expeditiously, especially in light of Marcus' failure to raise a specific objection to such resolution in a responsive pleading or at the hearing.

### B.  Findings of Fact

Marcus challenges multiple parts of the court's order on the TEDRA petition. To analyze whether the court erred in entering the provisions of the order, we first consider whether substantial evidence supports the challenged findings of fact that form the basis of the court's conclusions and orders. Bartlett v. Betlach, 136 Wn.

- 19 -

App. 8, 17–18, 146 P.3d 1235 (2006).  Then, we determine whether the findings support the trial court's conclusions of law. Id. at 18.

        1.     Waiver

Antoinette argues that Marcus may not challenge averments that he failed to deny in a responsive pleading.  Generally, after the filing of a pleading which sets forth a claim for relief, the party against whom the suit is filed "shall state in short and plain terms the defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies." CR 8(b).  A defendant shall serve an answer within the period fixed by an applicable statute. CR 12(a)(4). "Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading." CR 8(d).

The statute detailing the procedural rules for TEDRA suits states that a summons must be served containing substantially similar language to the following:

> In order to defend against or to object to the petition, you must answer the petition by stating your defense or objections in writing, and by serving your answer upon the person signing this summons not later than five days before the date of the hearing on the petition. Your failure to answer within this time limit might result in a default judgment being entered against you without further notice. A default judgment grants the petitioner all that the petitioner seeks under the petition because you have not filed an answer.

RCW 11.96A.100(3).  A party may seek a default when "a party against whom a judgment for affirmative relief is sought has failed to appear, plead, or otherwise defend as provided by these rules." CR 55(a)(1).

To comply with the civil rules, Marcus should have filed an answer within the applicable time frame in the statute. Marcus' only filing in response to Antoinette's TEDRA petition was a motion for a stay that did not admit or deny any of the averments in the petition. However, the remedy for an opposing party's failure to file a responsive pleading is default. Antoinette did not seek a default for failure to plead.

Additionally, Antoinette does not appear to have argued before the trial court that the unanswered averments in her petition were admitted, only that the evidence was unrebutted. The trial court considered the TEDRA petition on the merits at the hearing. Marcus cites a similar case in which a party did not argue that unanswered averments were admitted and the trial court proceeded to consider the case on the merits. Card v. W. Farmers Ass'n, 72 Wn.2d 45, 48, 431 P.2d 206 (1967). In that instance, the Washington Supreme Court concluded that "all such admissions were deemed waived and the trial court properly treated the case as if a general denial were in the record." Id.

Here, as in Card, any admissions were waived when Antoinette failed to argue that they were admitted. The trial court properly treated the case as if a general denial were in the record.

2. Findings of Fact in the TEDRA Order

Marcus assigns error to nine of the findings of fact in the TEDRA order. First, he challenges the finding that he commingled Bernice's assets with his own by depositing her funds into one or more accounts over which he claims ownership. The bank statements showed multiple transfers from accounts owned by Bernice

or co-owned by Bernice and Marcus into an account solely in Marcus' name. There was substantial evidence supporting this finding.

The next two challenged findings are similar and may be addressed together. The first is that Marcus had not provided an accounting to the co-trustee or trust beneficiary. The court also found that "[t]here is significant Trust income that was under the control of Marcus E. Price and there has been no accounting for the disposition of hundreds of thousands of dollars of Trust income since Marcus E. Price was appointed Co-Trustee of the Bernice K. Price-Cameron Trust on February 16, 2007." There was evidence that the apartment building had a potential annual net profit of over $100,000.00. Antoinette asserted that when she filed the petition, she had not received any accounting of this income from Marcus despite repeated requests over a period of years. Marcus did not file a complete accounting during the pendency of the case. There was substantial evidence to support these findings.

Marcus also contends the court erred in finding that documentary evidence established that he received settlement proceeds from Farmers Insurance in the amount of $184,031.41 for Bernice's benefit in 2017 and 2018, that he had possession and control of these funds, and that he had not accounted for $45,450.91 of these proceeds. Antoinette provided a claim summary from Farmers Insurance showing $184,031.41 in payments made during 2017 and 2018. The claim summary does not show the recipient of these payments. Marcus argued that his declaration filed in the VAPO action showed that he had paid $138,580.50 to the general contractor for the repairs to Bernice's house. He did

not provide an accounting of the remaining $45,450.91. Substantial evidence supports this finding.

Marcus challenges the court's finding that documentary evidence established that he had received $129,276.38 in rental income from Price Catalina Apartments from January through July 2018 on Bernice's behalf, that he had possession and control over this income, and that he had not adequately accounted for the income. Marcus submitted documentation with his declaration in the VAPO action showing $129,276.38 in rental and laundry income from January to July 2018. Although he submitted various other receipts, bills, and payment confirmations, he did not provide a full accounting of how this money was spent. Substantial evidence supports this finding.

Marcus assigns error to the finding that, as of the entry of the order, "documentary evidence establishes that $174,727.29 is missing and unaccounted for from the trust income and assets that were under the control of the Respondent. Respondent has refused to account for the missing trust assets and has refused to return any of the missing trust assets to the Trust." The finding contains the sum of the unaccounted funds from the insurance proceeds and the rental income. Both the home covered by the insurance claim and the apartment building were trust assets. It is undisputed that Marcus managed the trust income and assets during the relevant time period. Substantial evidence supports this finding.

Next, Marcus contends that the court erred in finding that clear, cogent and convincing evidence established that he had willfully used and controlled Bernice's assets for his own benefit and not for Bernice's benefit while she was incapacitated

and/or unable to care for herself. It is undisputed that Bernice was unable to care for herself, and Antoinette asserted this fact and provided opinions from Bernice's doctors to the same effect. She also presented evidence that Bernice was not able to afford the care she needed. The bank statements showed that trust funds were repeatedly transferred to Marcus' personal account. Substantial evidence supports this finding.

Marcus challenges the finding that clear, cogent, and convincing evidence established that Bernice would suffer additional financial harm if he was not removed as co-trustee and prohibited from having any access to or control over her funds. Antoinette presented evidence of past financial harm to Bernice while Marcus acted as co-trustee and managed her finances. The bank statements showed that the transfers to Marcus' account continued until Bernice's accounts were closed in June 2018. Substantial evidence supported this finding.

Finally, Marcus assigns error to the following finding of fact:

> Delaying these proceedings for an indefinite period of time would result in prejudice to the Vulnerable Adult by increasing her costs and attorneys' fees, delaying judgment, delaying Respondent's removal, and subjecting the Vulnerable Adult to ongoing uncertainty. The passage of time increases the risk that evidence will become stale or unavailable. The Vulnerable Adult requires costly care that she cannot currently afford due to the depletion of her assets by the Respondent.

As noted above, the record contained evidence that Bernice could not afford the care she needed. The other listed consequences would logically flow from a delay in proceedings. Substantial evidence supported this finding.

C.      Removal as Co-Trustee

Marcus also contends that the court erred in removing him as co-trustee. Trustees, as fiduciaries, owe the highest degree of good faith, care, loyalty, and integrity to the beneficiaries of the trust. Esmieu v. Shrag, 88 Wn.2d 490, 498, 563 P.2d 203 (1977).  Trustees are not permitted to manage the affairs of the trust or deal with the trust property so as to gain any direct or indirect advantage for themselves. Tucker v. Brown, 20 Wn.2d 740, 768, 150 P.2d 604 (1944).

A trustee may petition the superior court for the change of a co-trustee for reasonable cause. RCW 11.98.039(4).   Breach of fiduciary duty, a conflict of interest between the trustee and the beneficiary, or bad will generated by litigation are examples of reasonable cause to remove a trustee. In re Estate of Ehlers, 80 Wn. App. 751, 761, 911 P.2d 1017 (1996).   "A court has a 'wide latitude of discretion' to remove the trustee, 'when there is sufficient reason to do so to protect the best interests of the trust and its beneficiaries.'" In re Estate of Cooper, 81 Wn. App. 79, 94–95, 913 P.2d 393 (1996) (quoting Schildberg v. Schildberg, 461 N.W.2d 186 (Iowa 1990)).  The Washington Supreme Court has cautioned that the power of removal of a trustee should be exercised sparingly and only when there is misconduct showing a lack of capacity or fidelity that jeopardizes the trust. Cornett v. West, 102 Wash. 254, 264, 173 P. 44 (1918).  A trial court's decision to remove a trustee is reviewed for an abuse of discretion. In re Marriage of Petrie, 105 Wn. App. 268, 275, 19 P.3d 443 (2001).

Here, the court concluded that Marcus had breached his fiduciary duty to Bernice and that good cause had been established for removing Marcus as co-

trustee. The findings that Marcus had used trust funds for his own benefit rather than Bernice's and that he had failed to account for trust funds support the conclusion that he breached his fiduciary duty to Bernice. This breach also supports the conclusion that good cause existed to remove Marcus as co-trustee. The court did not abuse its discretion in removing Marcus as co-trustee.

### D.    Cost of Accounting and Attorney Fees

Marcus also argues that the court erred in awarding Antoinette attorney fees and costs and in requiring him to pay the costs of obtaining an accounting personally.

In a TEDRA action, the superior court "may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party." RCW 11.96A.150(1). "The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable." Id. We review an award of attorney fees and costs under TEDRA for an abuse of discretion. In re Estate of Wimberley, 186 Wn. App. 475, 512, 349 P.3d 11 (2015).

The court concluded that it was equitable for Marcus to pay "the costs of obtaining the accounting ordered herein as well as the attorneys' fees incurred by Petitioner in maintaining these actions." In her amended petition, Antoinette requested that Marcus be ordered to provide an accounting and personally bear the cost of doing so. She also requested an award of attorney fees.

Marcus contends that the trust should be responsible for the cost of any accounting that he provides. He relies on In re Estate of Cooper in support of his

argument that the cost of a trustee's accounting is typically charged to the trust. 81 Wn. App. 79. In Cooper, the court relied on CR 26(b)(5) and 37(a)(4) to award accountant fees to a trustee for an accounting prepared in response to a petition when the court found in the trustee's favor on the question of whether the accounting adequately traced the estate's assets. Id. at 93–94. Cooper does not clearly compel the court to charge the accounting fees to the trust, especially under this very different set of facts. Marcus has not shown that the court abused its discretion in concluding that it was equitable under these circumstances for him to bear the cost of the accounting.

Marcus also argues that the award of attorney fees was not supported by the findings of fact. However, the findings that Marcus used trust funds for his own benefit and failed to account for missing funds support the court's conclusion that it was equitable for Marcus to pay the fees incurred in bringing this action. Marcus has not shown that the court abused its discretion in awarding attorney fees.

III.     Motion for Reconsideration

Marcus also contends that the court erred in denying his motion for reconsideration. A court's ruling on a motion for reconsideration under CR 59 is reviewed for an abuse of discretion. Pac. Indus., Inc. v. Singh, 120 Wn. App. 1, 11, 86 P.3d 778 (2003).

On the motion of an aggrieved party, the trial court may reconsider an order on one of nine bases materially affecting the substantial rights of the party. CR 59(a). These reasons include:

(4) Newly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at the trial;

. . .

(6) Error in the assessment of the amount of recovery whether too large or too small, when the action is upon a contract, or for the injury or detention of property;

(7) That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law;

(8) Error in law occurring at the trial and objected to at the time by the party making the application; or

(9) That substantial justice has not been done.

Id.

Marcus assigns error to the court's finding that:

To the extent that Marcus Price filed new documents in support of his Motion for Reconsideration, he failed to show that they constituted newly discovered evidence which with reasonable diligence he could not have discovered and produced at or prior to the November 9, 2018 hearing. This Court did not consider any such documents.

Both parties appear to read this finding to say that the court entirely declined to consider the evidence submitted with the motion for reconsideration because it was untimely. The court did not find the motion untimely and decided the motion on the merits. It stated that it considered both memoranda and declarations filed in support of the motion. The order stated only that the court did not consider any evidence that was not newly discovered and therefore could have with reasonable diligence been discovered and produced at or before the hearing. Marcus admits that almost all of the documents in the materials filed on reconsideration "merely summarized and clarified evidence that was already in the record." Although the court appears to have decided the motion for reconsideration under CR 59(a)(4)

rather than the bases put forth in Marcus' memoranda, Marcus does not argue that this was error.

Marcus does not raise any other argument challenging the denial of reconsideration. He has not shown that the trial court abused its discretion in denying his motion for reconsideration.

IV. Attorney Fees on Appeal

Both parties request an award of attorney fees and costs on appeal under RCW 11.96A.150. A party may request an award of attorney fees and costs if applicable law provides the right to recover fees and costs on appeal. RAP 18.1(a). Under TEDRA, the appellate court may award reasonable attorney fees and costs as it deems equitable to any party "(a) [f]rom any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings." RCW 11.96A.150(1).

Both parties argue that they should be awarded fees as the prevailing party on appeal. Because Antoinette is the prevailing party on appeal, it is equitable that she be awarded attorney fees from Marcus.

Affirmed.

WE CONCUR:

Mann, C.J.